POSTILL v BOOTH NEWSPAPERS, INC

Docket Nos. 55959, 55990, 55996. Submitted April 8, 1982, at Detroit.
—Decided August 23, 1982. Leave to appeal applied for.

On July 11, 1976, Frederick J. Postill was the Washtenaw County
Sheriff, Frank Donley was the Washtenaw County jail adminis-
trator, Basil Baysinger was a Washtenaw County Deputy
Sheriff, Carl Parsell was the director of the Police Officers
Association of Michigan, and William Treml was a reporter for
Booth Newspapers, Inc. On that day Postill, Donley, Baysinger,
and Mrs. Baysinger were at a wedding reception in Chelsea,
Michigan. A brawl erupted involving the four during which
Postill allegedly drew a gun and announced he was going to
blow a hole in Baysinger. After the altercation, the Baysingers
received medical attention, then went home. Shortly after the
incident, a Washtenaw County deputy heard Postill say to
Donley, "Let's go get Baysinger". The deputy interpreted "get"
to mean "kill". He contacted Baysinger and told him that
Postill and Donley had threatened to kill him. Baysinger tele-
phoned Washtenaw County Deputy Sheriff Raymond Zakrzew-
ski, a union steward in the Police Officers Association of
Michigan, because he was afraid for his life and that of his
wife. Zakrzewski telephoned Carl Parsell to inform him that

REFERENCES FOR POINTS IN HEADNOTES
[1] 50 Am Jur 2d, Libel and Slander §§ 9-11, 498, 502.
[2] 50 Am Jur 2d, Libel and Slander §§ 297-301, 503.
    Libel and slander: what constitutes actual malice within federal
        constitutional rule requiring public officials and public figures to
        show actual malice. 20 ALR3d 988.
    Libel and slander: who is a public official or otherwise within the
        federal constitutional rule requiring public officials to show actual
        malice. 19 ALR3d 1361.
    Constitutional aspects of libel or slander of public officials. 95
        ALR2d 1450.
[3] 50 Am Jur 2d, Libel and Slander §§ 195-198, 301, 503.
[4] 50 Am Jur 2d, Libel and Slander §§ 301, 503.
[5] 5 Am Jur 2d, Appeal and Error § 623.
[6] 22 Am Jur 2d, Damages §§ 238-240.
    Power of equity court to award exemplary or punitive damages. 48
        ALR2d 947.

Baysinger and his wife had been assaulted and were in fear of their safety. Police protection was requested for Baysinger that Sunday but Parsell did not take any action due to the lack of information. On Monday morning, July 12, 1976, Baysinger met with members of the local press, including William Treml, to relate his version of the incident. Baysinger told the press that he was in fear of his family's safety and had moved out of his home. On that Monday and the following Tuesday and Wednesday, the Ann Arbor News published the charges and counter-charges. These articles are not the subject of this action. Between Monday and Wednesday, Deputy Zakrzewski was in contact with Parsell. Zakrzewski conducted an investigation and relayed to Parsell that the death threats appeared to be serious and that Postill and Donley had exhibited violent tendencies in the past and could carry out the threats. Parsell, on the basis of that information, drafted and sent a mailgram to the director of the Michigan State Police outlining the information he had received and asking for protection for Baysinger and his wife. Reporter Treml received a copy of the mailgram and attempted to verify it as he was directed to do by the assistant city editor. Treml was able to confirm that the mailgram was sent and received. He was not able to independently verify all of the statements contained in the mailgram. In its Thursday, July 15, edition, the Ann Arbor News reported these events in two front-page articles. One was entitled *"Protection Asked:* Death Threats? Deputy Fearful"*, and was written by William Treml. The second article was entitled "Criminal Conduct Denied by Sheriff", was written by John Barton, and gave Postill's side of the story. Treml's article contained an excerpt from Parsell's mailgram. In addition, it stated that Baysinger "said he had received reports of death threats made against him and his wife by Postill and Donley since the Chelsea incident". Baysinger had been suspended without pay by the sheriff's department. The suspension was the basis of a union grievance filed by Zakrzewski against the department on behalf of Baysinger. Thursday afternoon, July 15, Zakrzewski told Treml of the grievance report and gave him a copy of it. The report included allegations of fits of anger by Postill and Donley. Treml questioned Zakrzewski about the report but he responded that no specifics would be given out until the deputies received job protection. Zakrzewski had indicated that 20 to 25 deputies would be willing to come forward to verify the wrongdoings. Treml, again at the insistence of his editor, spoke with various law enforcement officials in an attempt to verify the charges. Furthermore, Treml later testified that the

charges had a ring of truth to them from his own knowledge of Postill's and Donley's characters. On Friday, July 16, the Ann Arbor News published an article by Treml entitled "Deputies Ask to Testify. Against Postill". The article, citing an unidentified source, mentioned assaults by Postill and Donley and that "the source said department and prisoner funds have been stolen, equipment misappropriated and misconduct by 'Postill favorites' overlooked". The Ann Arbor News published an article coauthored by Treml on Saturday, July 17, which was entitled "Hear Deputies, Board Told". This article was the third and final article which was the subject of the instant case. Postill and Donley brought an action for libel in the Washtenaw Circuit Court against Booth Newspapers, Treml, Parsell, POAM, and Baysinger. The jury returned a joint verdict of $200,000 against all the defendants in compensatory and exemplary damages in favor of Postill, and $100,000 in compensatory and exemplary damages in favor of Donley. The jury also awarded Postill $500,000 in punitive damages and awarded Donley $200,000 in punitive damages. The trial court, Harold E. Van Domelen, J., struck the punitive damages awards as contrary to Michigan law and so grossly excessive as to shock the conscience of the court. The defendants each appealed the verdict and the plaintiffs each appealed the court's striking of the punitive awards. The appeals were consolidated. *Held:*

1. Postill and Donley were public officials claiming to have been defamed in that capacity and must show actual malice. Actual malice means that the defamer published a statement with knowledge that it was false or with reckless disregard of whether it was false or not. The "reckless disregard of whether a statement is false or not" element of actual malice is not measured by whether a reasonably prudent man would have published or would have investigated before publishing but by whether the defendant in fact entertained serious doubts as to the truth of his publication. Ill will, spite, hatred, failure to investigate or even attempt to do harm to a plaintiff do not amount to actual malice. The evidence was insufficient to show that any of the defendants acted with actual malice.

2. Punitive damages are allowed only to compensate a plaintiff for his injuries and not as a method of punishment. The court's instruction that punishment might be considered in assessing punitive damages was error, but the court's striking of the award of punitive damages rendered the error harmless.

Reversed.

1. LIBEL AND SLANDER — ACTIONS.

The following elements must be proven to demonstrate liability

for defamation: (1) a false and defamatory statement concerning plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation *per quod*).

2. LIBEL AND SLANDER — ACTUAL MALICE.

Actual malice means that the defamer published a statement with knowledge that it was false or with reckless disregard of whether it was false or not; actual malice must be proven to sustain an action for defamation where the defamed person is a public official defamed in his role as such.

3. LIBEL AND SLANDER — PRIVILEGE — QUALIFIED PRIVILEGE — ACTUAL MALICE.

A qualified privilege exists for all bona fide communications upon any subject in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty; a qualified privilege is lost where it has been abused; proof of actual malice is proof of abuse of a qualified privilege.

4. LIBEL AND SLANDER — ACTUAL MALICE — "RECKLESS DISREGARD".

The "reckless disregard of whether a statement is false or not" element of actual malice is not measured by whether a reasonably prudent man would have published or would have investigated before publishing but by whether the defendant in fact entertained serious doubts as to the truth of his publication; ill will, spite, hatred, failure to investigate or even attempt to do harm to plaintiff do not amount to actual malice.

5. APPEAL — JURY INSTRUCTIONS — PRESERVING QUESTION.

Appellate review of jury instructions which were not objected to at trial is precluded absent manifest injustice.

6. DAMAGES — PUNITIVE DAMAGES.

Punitive damages are allowed only to compensate a plaintiff for his injuries and not as a method of punishment.

*Neal Bush* and *Philip Green,* for Frederick J. Postill and Frank Donley.

*Butzel, Long, Gust, Klein & Van Zile* (by *Richard E. Rassel* and *James E. Stewart),* and *Burke,*

*Rennell & Hood,* for Booth Newspapers, Inc., and William B. Treml.

*Garris, Garris & Garris, P.C.,* for Basil Baysinger.

*Gregory, Van Lopik, Moore & Reakle, Brownson Murray,* of counsel, for Carl Parsell and the Police Officers Association of Michigan.

Before: CYNAR, P.J., and D. C. RILEY and R. R. FERGUSON,* JJ.

D. C. RILEY, J. This litigation arises out of an altercation which occurred during the early morning hours of July 11, 1976, at the Chelsea Fairgrounds. Those involved could not have conceived of the lengthy libel action which would have its genesis in that brawl. The trial in this action consumes over 4,000 pages of transcript, all as a result of the melee involving Frederick J. Postill, Frank Donley, and Basil Baysinger. All three of these individuals were at a wedding reception in Chelsea, Michigan, on that auspicious evening. Postill, at the time, was the elected sheriff of Washtenaw County. Donley was the appointed Washtenaw County jail administrator, and Baysinger was a Washtenaw County deputy sheriff.

Many of the pertinent facts surrounding the wedding reception altercation are in dispute. The dispute which embroiled Postill, Donley, and Baysinger also involved Mrs. Baysinger at various points. All of the participants seemed to have been punched, kicked, or choked during the melee which started in the parking lot and continued back into the hall. Postill allegedly drew a gun and announced that he was going to "blow a hole"

---

* Circuit judge, sitting on the Court of Appeals by assignment.

in Baysinger. Two uniformed Chelsea police officers who had been called to the scene finally separated everyone and restored order.

Washtenaw County Deputy Sheriff Richard Compton testified that, shortly after the incident, Postill said to Donley, "Let's go get Baysinger." Compton interpreted "get" to mean "kill". Compton contacted Baysinger and told him that Postill and Donley had threatened to kill him.

The Baysingers received medical attention and then went home. Baysinger telephoned Washtenaw County Deputy Raymond Zakrzewski, a union steward in the Police Officers Association of Michigan (hereinafter POAM), because he was afraid for his life and that of his wife. The news of the Chelsea incident spread quickly, as Zakrzewski was already aware of the event when Baysinger called, having received calls from other sheriff's department employees. In addition, Baysinger called the Ypsilanti police post, Ann Arbor News reporter Nancy Dunn, and Ypsilanti Press reporter Joyce Tyson, to alert them of the situation. Baysinger's attorney telephoned Ann Arbor News reporter William Treml. Postill telephoned the city editor of the Ann Arbor News with his version of the event.

Zakrzewski telephoned Carl Parsell, the director of POAM, to inform him that Baysinger and his wife had been assaulted and were in fear of their safety. Police protection was requested for Baysinger that Sunday but Parsell did not take any action due to the lack of information available.

On Monday morning, July 12, Baysinger met with members of the local press, including William Treml, to relate his version of the incident. Baysinger told the press that he was in fear of his family's safety and had moved out of his home. On

that Monday and the following Tuesday and Wednesday, the Ann Arbor News published the charges and counter-charges. These articles are not the subject of this action.

Between Monday and Wednesday, Deputy Zakrzewski was in contact with Parsell. Zakrzewski conducted an investigation and relayed to Parsell that the death threats appeared to be serious and that Postill and Donley had exhibited violent tendencies in the past and could carry out the threats. Parsell, on the basis of that information, drafted and sent the following mailgram to the director of the Michigan State Police.

"TO COL. GEORGE L. HALVERSON AN URGENT REQUEST FOR '24 HOUR ROUND THE CLOCK PROTECTION' FOR A POLICE OFFICER AND HIS WIFE FOR FEAR OF HIS LIFE.

"THIS REQUEST IS MOST URGENT AND OF A MOST SERIOUS NATURE BECAUSE WE ARE ASKING THE PROTECTION FROM (FROM) THE CHIEF LAW ENFORCEMENT OFFICER WASHTENAW COUNTY SHERIFF FREDERICK POSTILE [sic] AND THE WASHTENAW COUNTY JAIL ADMINISTRATOR FRANK DONELY [sic].

"THIS IS ALL REGARDING THE INCIDENT THAT HAPPENED IN CHELSEA MICHIGAN JULY 10 AND 11, 1976 NOW UNDER INVESTIGATION BY YOUR OFFICE OF STATE POLICE.

"WITNESSES ALL HAVE AGREED THAT THE DEPUTY, BASIL BAYSINGER OF WASHTENAW COUNTY AND HIS WIFE WHILE OFF DUTY ATTENDING A WEDDING WERE PHYSICALLY ATTACKED BY SHERIFF POSTILE [sic] AND JAIL ADMINISTRATOR DONELY [sic].

"WITNESSES HAVE MADE IT VERY CLEAR THAT THE SHERIFF AND THE JAIL ADMINISTRATOR HAVE PUBLICLY AND PRIVATELY, BOTH AT THE INCIDENT AND AFTER THE INCIDENT,

STATED THAT THEY ARE GOING TO KILL DEPUTY BASIL BAYSINGER AND HIS WIFE.

"THIS SHOULD NOT BE TAKEN LIGHTLY, AS THE RECORD IS VERY CLEAR THAT THE PRESENT JAIL ADMINISTRATOR, FRANK DONELY [sic] HAS A LONG CRIMINAL RECORD INCLUDING VIOLENT ASSAULT, THE RECORD IS ALSO VERY CLEAR THAT SHERIFF POSTILE [sic] HAS BEEN INVOLVED IN SEVERAL FELONIOUS ASSAULTS OF PRIVATE CITIZENS REPORTEDLY INVOLVING PISTOL WHIPPING.

"THE REQUEST FOR PROTECTION FOR OFFICER BASIL AND HIS WIFE IS MADE TO THE STATE POLICE BECAUSE OF CONFLICTS OF INTEREST AND BECAUSE THE ISSUE IS BEING HANDLED IN WASHTENAW COUNTY AS A 'HOT POTATO'.

"I URGE COL. HALVERSON TO ACK [sic] WITH UTMOST SPEED IN PROTECTING THIS CITIZEN AND OFFICER AND HIS WIFE UNTIL THIS CASE CAN BE ADJUDICATED THROUGH THE COURTS.

"CARL PARSELL EXECUTIVE DIRECTOR POLICE OFFICERS ASSOCIATION OF MICHIGAN."

Reporter Treml received a copy of the mailgram and attempted to verify it as he was directed to do by the assistant city editor. Treml was able to confirm that the mailgram was sent and received. He was not able to independently verify all of the statements contained in the letter.

In its Thursday, July 15, edition, the Ann Arbor News reported these events in two front-page articles. One was entitled "Protection Asked: Death Threats? Deputy Fearful", and was written by William Treml. The second article was entitled "Criminal Conduct Denied by Sheriff", was written by John Barton, and gave Postill's side of the story. Treml's article contained an excerpt from Parsell's mailgram. In addition, it stated that Baysinger "said he had received reports of death

threats made against him and his wife by Postill and Donley since the Chelsea incident".

Baysinger had been suspended without pay by the sheriff's department. The suspension was the basis of a union grievance filed by Zakrzewski against the department on behalf of Baysinger. Thursday afternoon, July 15, Zakrzewski told Treml of the grievance report and gave him a copy of it. The report included allegations of fits of anger by Postill and Donley. Treml questioned Zakrzewski about the report, but he responded that no specifics would be given out until the deputies received job protection. Zakrzewski had indicated that 20 to 25 deputies would be willing to come forward to verify the wrongdoings. Treml, again at the insistence of his editor, spoke with various law enforcement officials in an attempt to verify the charges. Furthermore, Treml testified that the charges had a ring of truth to them from his own knowledge of Postill's and Donley's characters.

On Friday, July 16, the Ann Arbor News published an article by Treml entitled "Deputies Ask to Testify Against Postill". The article, citing an unidentified source, mentioned assaults by Postill and Donley and "[t]he source said department and prisoner funds have been stolen, equipment misappropriated and misconduct by 'Postill favorites' overlooked".

The Ann Arbor News published an article coauthored by Treml on Saturday, July 17, which was entitled "Hear Deputies, Board Told". This article was the third and final article which was the subject of the instant case.

The attorneys for plaintiffs demanded a retraction on July 18 but no retraction was made. This

libel action then is based on articles in three days of publication and specifically seven separate paragraphs.[1]

The jury trial in this case commenced on March 31, 1980, and concluded on May 9, 1980. The jury

---

[1] The following are the paragraphs which form the basis of this libel action.

"(a) 'The witnesses have made it very clear that the Sheriff and the Jail Administrator have publicly and privately, both at the incident and after the incident stated that they were going to kill Deputy Basil Baysinger and his wife. This should not be taken lightly, as the record is clear that the present Jail Administrator, Frank Donley, has a long criminal record including violent assault. The record is also clear that Sheriff Postill has been involved in several felonious assaults of private citizens involving pistol-whipping.' (Thursday, July 15, 1976, Page 1.)

"(b) 'Baysinger had received reports of death threats made against him and his wife by Sheriff Postill and Mr. Donley since the Chelsea incident.' (Thursday, July 15, 1976, Page 1.)

"(c) 'While the grievance is confined to officer reports of assaults by Postill and Donley one source said that angle is "only the tip of the iceberg." The source said department and prisoner funds have been stolen, equipment misappropriated and misconduct by "Postill favorites" overlooked.' (Friday, July 16, 1976, Page 1.)

"(d) 'They can't do this. We've got a lot to say. But if we talk without a solid guarantee there won't be revenge taken by the Sheriff we might as well turn in our badges right now. He'll fire us in a minute.' (Friday, July 16, 1976, Page 1.)

"(e) 'One officer said he estimated there would be between 25 and 50 deputies and employees who would be willing to appear before commissioners to tell of various aspects of what he termed "total misadministration" by Postill. Included in what one source said was a "long list" of incidents is a recent one involving the permitting of a prisoner charged with murder having sex relations with a woman in a jail office.' (Friday, July 16, 1976, Page 1.)

"(f) 'One officer said there are more than 25 deputies who say they have knowledge of a wide range of improprieties from beating of prisoners to theft of department funds. But if deputies spoke out without a guarantee against mass firings it would mean immediate discharge by Postill, the officer said.' (Saturday, July 17, 1976, Page 1.)

"(g) 'The fear of firing if testimony is given about the Postill administration was expressed again late Friday by a deputy. He was asked if he or other officers would be willing to detail to the *Ann Arbor News* specific incidents of misconduct or improprieties providing deputy names were not used. "That would just get us all fired", the deputy said. "Postill is even now pushing his snitches to nail us. He'd trace to the officers involved any account of incidents no matter if there was a name published or not." (Saturday, July 17, 1976, Page 2.)"

returned a joint verdict of $200,000 against all the defendants in compensatory and exemplary damages in favor of Postill, and $100,000 in compensatory and exemplary damages in favor of Donley. The jury also awarded Postill $500,000 in punitive damages and awarded Donley $200,000 in punitive damages. The trial court struck the punitive awards as contrary to Michigan law and so grossly excessive as to shock the conscience of the court. The defendants each appeal the verdict and the plaintiffs each appeal the court's striking of the punitive awards.

We reverse the verdicts as to the defendants on the grounds that the evidence was insufficient to demonstrate actual malice. Numerous other issues raised by the parties are discussed in an effort to bring this matter to a final resolution.

I

To demonstrate liability for defamation, the following elements must be proven: (a) a false and defamatory statement concerning plaintiff; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation *per quod*). Restatement Torts (2d), § 558. Once the plaintiff has met his burden as to these common-law elements, the defendant brings forth his defenses of truth or privilege. The fault which a plaintiff must prove varies with whether the allegedly defamed person, plaintiff, is a "public official or figure" or a private person. The distinction between public and private persons was recognized in *New York Times Co v*

*Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964).

The *Sullivan* Court determined that the First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, does not permit a public offical who has been defamed in his role as a public official to maintain an action for defamation unless he proves that the defendant acted with "actual malice". Actual malice means that the defamer published the statement with knowledge that it was false or with reckless disregard of whether it was false or not. This term has a definition with constitutional implications and varies from common-law malice.

In this case, since Postill and Donley were public officials defamed in their roles as such, they had to prove that the defendants each, separately and individually, published his statements with constitutional actual malice. The proof of this element has to be presented with convincing clarity. *Sullivan,* 376 US 254, 285-286. The proofs necessary in a defamation action involving a public official, which we shall call constitutional defamation, therefore, are stricter than those necessary in a common-law action involving private citizens. Truth is a defense in both common-law and constitutional defamation.

In the common law of defamation, a defense of privilege exists. The defense of privilege is a matter of public policy that some communications are so necessary that, even if defamatory, they should be made. Therefore, the publisher is protected from liability by the privilege defense. Privileged communications may be either absolutely privi-

leged or qualifiedly privileged. The difference between absolute and qualified privileges is that the latter affords the publisher protection only in the absence of ill will, spite, or malice in fact. 50 Am Jur 2d, Libel and Slander, § 192, p 696. Common-law malice which destroys a qualified privilege is different than the *Sullivan* actual malice. The terms malice and actual malice unfortunately have not always been precisely defined or appropriately used. The confusion which arises from inexact usage was noted and continued in *Wynn v Cole,* 91 Mich App 517, 523; 284 NW2d 144 (1979).[2]

In this case, the defendants, POAM and Parsell claim that their communication was qualifiedly privileged. As stated in *Bacon v Michigan Central R Co,* 66 Mich 166, 170; 33 NW 181 (1887), a

---

[2] *Wynn v Cole,* 91 Mich App 517, 523; 284 NW2d 144 (1979), cites *Iacco v Bohannon,* 70 Mich App 463, 467; 245 NW2d 791 (1976), which did not involve a public figure and correctly used an ill will or spite definition of malice. Unfortunately, the Court used the term actual malice instead of malice. *Wynn,* concludes *Arber v Stahlin,* 382 Mich 300, 308; 170 NW2d 45 (1969), stands for the proposition that, in Michigan defamation law, only one definition of "malice" exists and that is *Sullivan's (New York Times Co v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 [1964]) actual malice definition. However, *Arber* involved a reversal of a summary judgment order against a person who was arguably a public figure and, therefore, the discussion of actual malice was appropriate. We recognize that as far back as 1927, in *Fortney v Stephan,* 237 Mich 603, 610; 213 NW 172 (1927), the Court stated that a qualified privilege is shattered if the statement was made with actual malice. However, *Fortney* preceded *Sullivan* by 37 years and the term actual malice does not have the same definition in both cases. *Fortney* stated that publications qualifiedly privileged are not actionable unless made in bad faith or with actual malice or without reasonable cause to believe them true. Malice is defined as ill will in *Bacon v Michigan Central R Co,* 66 Mich 166, 173; 33 NW 181 (1887), which was cited in *Fortney.*

The distinction between common-law malice and constitutional actual malice was articulated in *Orr v Argus-Press Co,* 586 F2d 1108, 1109 (CA 6, 1978), *cert den* 440 US 960; 99 S Ct 1502; 59 L Ed 2d 773 (1979). As the *Orr* Court stated: "Few areas of the law are as analytically difficult as that of libel and slander where courts attempt to mesh modern, first amendment principles with common law precedents * * * but as a legal and practical matter, the two approaches are bound together." *Id.,* 1111-1112.

qualified privilege exists for "all communications
made bona fide upon any subject matter in which
the party communicating has an interest, or in
reference to which he has a duty, to a person
having a corresponding interest or duty". Argu-
ably then, Parsell had a qualified privilege to send
the mailgram to the state police. It is less clear
that Parsell had an interest or duty to forward
copies of the mailgram to the newspapers or the
reporters. Assuming all the copies sent were privi-
leged, that status is lost if Parsell abused the
privilege by acting with common-law malice, ill
will, or bad faith. The Restatement Torts, 2d,
suggests that, if a plaintiff proves the required
constitutional actual malice necessary to have a
cause of action when a public official is involved,
he has, by that very action, proved that any possi-
ble qualified privilege was abused. 3 Restatement
Torts, 2d, § 592A, pp 259-260. The Restatement's
position is logically and legally correct. Therefore,
in this case, if plaintiffs proved the defendants
acted with constitutional actual malice, the com-
mon-law defense of privilege would be useless.

Defendants Booth Newspaper and Treml claim
to be entitled to a constitutional privilege. POAM
and Parsell aver that the same constitutional priv-
ilege applies to them since, at most, the mailgram
repeats the statements of third parties. The case
which is cited by the defendants as controlling is
*Edwards v National Audubon Society, Inc,* 556 F2d
113 (CA 2, 1977), *cert den sub nom Edwards v New
York Times Co,* 434 US 1002; 98 S Ct 647; 54 L Ed
2d 498 (1977).

In *Edwards,* the New York Times was being
sued because it had accurately reported the

charges of the National Audubon Society that five well-known scientists were liars paid by chemical companies to minimize the danger which the society claimed the pesticide DDT presented to bird life. The Court concluded that "when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity". *Id.*, 120. The privilege of neutral reportage encapsulates the above principle. The neutral reportage privilege though is destroyed, according to *Edwards, supra,* 120, if the publisher espouses or concurs in the charges made by others or deliberately distorts these statements to launch a personal attack of his own. The elements of the neutral reportage privilege are (1) serious charges against (2) a public figure by (3) a responsible and prominent organization which were reported (4) accurately and (5) disinterestedly. Therefore, even if the neutral reportage privilege is recognized in Michigan, these elements would have to be proved by defendants.

The privilege espoused in *Edwards* has not been adopted by the Supreme Courts of the United States or Michigan. We decline to embrace *Edwards* as the press is adequately protected by the burden of proof required in *Sullivan.* See, also, *Dickey v CBS Inc,* 583 F2d 1221, 1225 (CA 3, 1978). Therefore, defendants had no constitutional neutral reportage privilege and any common-law privilege would be destroyed if the jury found defendants acted with actual malice.

## II

The defendants claim that the trial court erred

in its instruction of actual malice. The *Sullivan* Court defined actual malice as making a statement "with knowledge that it was false or with reckless disregard of whether it was false or not". 376 US 254, 280. Within the 30 pages of instructions given to the jury, the court stated that the plaintiffs had the burden of proof on five essential elements. The court listed the five elements of defamation and then required a sixth finding that "the written statements were published with actual malice as term *[sic]* is explained in these instructions". The court explicitly instructed the jury that plaintiffs had the burden of establishing actual malice by clear and convincing evidence. The court stated, "a publication is made with actual malice as that term is used in this charge if it is made with knowledge that it is false or with reckless disregard of whether it is false or not". The court did not err in its instruction regarding actual malice.

Defendants POAM and Parsell strenuously argue that the common-law malice, as defined by hostility and ill will, should have been instructed upon. POAM points out that a difference exists between malice standards under Michigan law and under the First Amendment. As earlier portions of this opinion indicate, we agree as to the distinction. See, also, *Cantrell v Forest City Publishing Co,* 419 US 245, 251-252; 95 S Ct 465; 42 L Ed 2d 419 (1974). However, the case at bar was only predicated on constitutional defamation. The plaintiffs, as public officials, were attempting to prove *Sullivan* actual malice and, as such, they were not seeking to prove common-law malice. The court was not requested to instruct on common-law malice and the failure to do so was not error.

## III

All the defendants aver that the evidence was

insufficient to establish that they, individually, acted with the requisite "actual malice". A reviewing court makes an independent examination of the whole record to determine if the evidence is sufficient to support the jury's finding of actual malice. *Time, Inc v Pape,* 401 US 279, 284; 91 S Ct 633; 28 L Ed 2d 45 (1971). A *de novo* review was undertaken, in this case, of the 4,000 plus pages of transcript. That review was undertaken with an understanding of the case law which defines actual malice.

Terms such as "actual malice" and "reckless disregard" for the truth or falsity of a statement cannot be fully encompassed in one infallible definition. *St Amant v Thompson,* 390 US 727, 730; 88 S Ct 1323; 20 L Ed 2d 262 (1968). However, the Court has stated that meaningful guidance can be gleaned from its cases. *Id.,* 317. In *Sullivan, supra,* the newspaper article was not found to be a reckless publication as the plaintiff failed to carry his burden since "the record failed to show that the publisher was aware of the likelihood that he was circulating false information". *St Amant,* 390 US 727, 731.

In *Garrison v Louisiana,* 379 US 64; 85 S Ct 209; 13 L Ed 2d 125 (1964), the Court "emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of * * * probable falsity'. 379 US at 74." *St Amant,* 390 US 727, 731. In *St Amant,* after reviewing its prior decisions, the Court stated it is clear "that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious

doubts as to the truth of his publication." *Id.* (Emphasis added.)

In this case, we cannot conclude that Baysinger acted with the necessary culpable state of mind. Deputy Baysinger said he had received reports of death threats made against him and his wife by plaintiffs. His statement was made, and republished, within a few days of the violent altercation involving Donley, Postill, Baysinger, and Mrs. Baysinger. The proofs show Baysinger had secondhand information that plaintiffs were going to "get" him. In light of the Chelsea brawl, Baysinger's interpretation and publication of this information is explainable. Plaintiffs have not, with clear and convincing evidence, demonstrated that Baysinger in fact entertained serious doubts as to the truth of his statement.

Defendants Parsell and POAM are being held accountable for the mailgram Parsell sent as executive director of POAM. The evidence plaintiffs brought forth centered around Parsell's verification procedures and the political motives of Parsell and his sources. The evidence produced fails to demonstrate in a clear and convincing manner that the mailgram was published with knowledge that its contents were false or with reckless disregard for veracity. The Supreme Court in *Garrison,* 379 US 64, 74, stated only false statements made with a high degree of awareness of their falsity were actionable. Plaintiffs failed to demonstrate that Parsell had the required degree of awareness. Parsell's failure to investigate further or any alleged political motivation does not necessarily establish actual malice. *Gertz v Robert Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974); *St Amant, supra.*

The strongest evidence supporting plaintiffs' claims involved defendant Treml. Treml was effectively cross-examined on various key issues. This cross-examination showed him to be a witness with questionable credibility. There existed apparent reciprocal political animosity between Treml and the plaintiffs. Ill will, spite, or even hatred, however, do not alone amount to the constitutionally required actual malice. Treml investigated his articles but he may not have been diligent in seeking out both sides of the story. Yet, failure to properly investigate does not constitute actual malice. *Gertz,* 418 US 323, 332. Even an intent on Treml's part to harm plaintiffs, without more, would not be sufficient in this case. *Henry v Collins,* 380 US 356, 357; 85 S Ct 992; 13 L Ed 2d 892 (1965). Again, this Court feels compelled by the Supreme Court's admonition in *Garrison,* 379 US 64, 74, that only false statements made with a high degree of awareness of their probable falsity are actionable, to reverse as to defendants Booth and Treml.

IV

Defendants would also have this Court find error in the instruction that the jury could return a joint verdict against all defendants. The jury was instructed:

"If you find one of the defendants to be liable, you shall determine the amount of damage he caused and return a verdict in that amount. If you find more than one of the defendants to be liable, you shall return a separate verdict for the amount of damages you determine each defendant caused, as indicated in the verdict form the court will furnish to you. However, if you find one or more of the defendants to be liable and after careful consideration of the evidence, you are unable to

determine the amount of damage each defendant has caused, then you shall not divide the plaintiffs' total damages among them, but your verdict shall be for the total damages again on one or more defendants whom you find to be liable. If you can determine the amount of damage caused solely by a defendant or defendants whom you find not liable, you shall not include those damages in the total amount."

Parsell, POAM, and Baysinger claim the instruction, allowing for a joint damage award, foist upon them damages attributable to Booth and Treml. The latter defendants also wish to be held liable only for the damages they have caused. First, it is noted that the instruction does not allow a finding of liability without fault; to do so would be error. *Gertz, supra,* 347. The jury was allowed to bring in a joint damage award only if they could not apportion the damages among the individual defendants they found liable. The instruction was proposed by defendants Booth and Treml. The other defendants did not object to the giving of it. Defendants may not claim instructional error unless they make a timely and specific objection. GCR 1963, 516.2. Their failure to object precludes appellate review since manifest injustice did not occur. *Drouillard v Metropolitan Life Ins Co,* 107 Mich App 608, 622; 310 NW2d 15 (1981).

## V

Defendants also claim that the damage instructions were erroneous. The court instructed the jury that they could award compensatory damages, exemplary damages, and punitive damages and that exemplary damages were awardable "if the libel is accompanied by circumstances of pecuniary aggravation which are calculated to vex and annoy the plaintiffs and cause them to suffer much be-

yond * * * what they would suffer as a monetary loss". The court instructed on punitive damages which it said were designed to punish the offender and serve as an example to others. Objections were lodged by the defendants regarding the punitive and exemplary damages instructions.

The jury awarded $300,000 in "compensatory and exemplary damages" and $700,000 in punitive damages. The punitive award was subsequently "cancelled" by the trial court due to its opinion that such damages were contrary to Michigan law. Defendants argue that the entire issue of damages must be retried since the jury was allowed to consider punishment in their deliberations. Plaintiffs argue that the punitive award should be reinstated.

The trial court's instructions and the jury's award separated actual damages from punitive damages. Thus, any error in instructing that punishment may be a factor in assessing damages was cured by the cancellation of the large punitive damage awards.

Defendants attempt to draw from *Peisner v Detroit Free Press, Inc,* 104 Mich App 59; 304 NW2d 814 (1981), the rule that remittitur is insufficient and a new trial must be conducted on the issue of damages whenever a jury is allowed to consider punishment in its deliberations. *Peisner,* however, does not stand for such an expansive rule. The jury in that case awarded exemplary damages that may have been returned as a form of punishment. Rather than simply striking the exemplary damages, the Court remanded for trial on the issue of damages under proper instructions. In this case, the proper awards were separated

from the improper award; therefore, there is no need to retry the damage issues.

The trial court's instruction that punitive damages to punish the defendants were awardable was against the great weight of Michigan law. Punitive damages in Michigan are allowed only to compensate a plaintiff for his injuries and not as a method of punishment. *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401, 419; 295 NW2d 50 (1980). Plaintiffs' argument, that case precedent should be overturned, is unconvincing. Plaintiffs also argue MCL 600.2911(1)(b); MSA 27A.2911(2)(b) changes the nature of punitive damages for libel cases and allows damages designed to punish defendants. We disagree. The Legislature knew of the Supreme Court's interpretation of the term "punitive damages" when it enacted that provision. There is nothing in the statute which indicates a desire to change existing law and allow punishment damages. The punitive damages award returned by the jury will not be reinstated.

Defendants also contend the instructions on compensatory and exemplary damages allowed a double recovery for injury to plaintiffs' feelings. The defendants objected at trial on the basis of *Peisner, supra.* In that case, the court instructed the jury on actual damages which were defined as damages to feelings, mental anguish, denial of social pleasures, embarrassment, ridicule, humiliation, fear, "and things like that". The *Peisner* trial court also instructed on exemplary damages. The Court of Appeals found that instruction to be basically correct but unnecessary since the actual damages instruction encompassed the type of injury normally part of exemplary damages.

In this case, the actual damages instruction was substantially similar to that used in *Peisner.* However, since actual damages and exemplary damages were combined on the verdict form, unlike in *Peisner,* the tendency to award double recovery for injury to feelings was eliminated. This distinction convinces this Court that no reversible error occurred in the court's definitions of actual and exemplary damages.

The remaining issues raised by the parties have been considered and no additional grounds for reversal exist. Specifically, we note that the actual damages award of $200,000 for Postill and $100,000 for Donley would not be considered excessive in this case had the plaintiffs met their constitutional burden of proof.

Reversed.

Costs to appellants.