**Milan CHONICH; Carmen Pascaretti, Plaintiffs–Appellants,**

v.

**WAYNE COUNTY COMMUNITY COLLEGE; Juanita C. Ford, Defendants–Appellees.**

**Nos. 90–1697, 90–2329.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 24, 1991.

Decided June 9, 1992.

As Amended Aug. 31, 1992.

Rehearing and Rehearing En Banc Denied Oct. 16, 1992.

Sue E. Radulovich (argued and briefed), Grosse Pointe, Mich., for plaintiffs-appellants.

Cynthia Adkison (argued and briefed), Kohl, Secrest, Wardle, Lynch, Clark & Hampton, Farmington Hills, Mich., Daniel J. Bretz (argued and briefed), Detroit, Mich., for defendants-appellees.

Before: MARTIN and JONES, Circuit Judges; and WELLFORD, Senior Circuit Judge.

## AMENDED OPINION

WELLFORD, Senior Circuit Judge.

This controversy has been before us on a prior occasion, reported at 874 F.2d 359 (1989) (*"Chonich I"*). We held, on appeal by defendant Wayne County Community College (Wayne), that damages awarded to plaintiffs totalling $875,000 in this civil rights action were speculative and excessive, and remanded for a new trial on the issue of damages with respect to plaintiffs Chonich and Pascaretti. We also remanded the case to the district court with respect to Wayne "for further consideration as to whether a new trial on ... liability issues is required because of the absence of *Monell*[1] instructions" which are sometimes necessary under § 1983 and Michigan Elliott–Larsen Civil Rights Act claims. *Id.* at 367. Additionally, we reversed the district court's dismissal of the plaintiffs' libel/def-

amation claim against Wayne and the dismissal of defendant Ford on the libel claim based on her assertion of privilege.

On remand, defendants filed motions for summary judgment on the libel/defamation issue involving whether Ford had acted as Wayne's agent and whether her contentions gave her immunity or barred any damages award against her. Defendant Wayne asked for a new trial on the civil rights claim and sought to add Edward Callaghan and Thomas Waters, former Wayne officials, as defendants on these claims. The district court ordered a new trial on all liability issues, but denied the motions to add Callaghan and Waters as additional defendants. The issues were then presented to a jury which was provided a special verdict form. When asked whether Wayne retaliated and whether defendants libeled plaintiffs, the jury answered "yes." After a week's deliberation, it awarded no damages. The jury found for defendants on the § 1983 racial discrimination claim and on the emotional distress claim. We have set out the essential facts in our earlier opinion, but in this second trial defendants produced a number of additional witnesses on some of the disputed factual issues.

Plaintiffs filed separate claims for back pay and damages for defamation/libel, discrimination, retaliation, denial of civil rights, and infliction of emotional distress based on alleged termination or elimination of their administrative positions at Wayne and transfers to equal-paying, but allegedly inferior, positions at the school. They also alleged that Wayne failed to award them faculty appointments and failed to grant them alternative and equivalent positions in a subsequent 1986 administrative reorganization. Plaintiffs claimed that Ford's libelous/defamatory statements, accusing them unjustly of racism, occurred in the course of her official relationship with Wayne ("as employee, servant/agent") and that they were a substantial contributing factor in Wayne's discriminatory/retali-

---

1. *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (deal- ing with liability of a state agency based on "official policy" or "custom and practice.").

atory actions. The parties stipulated these facts:

1. On February 29, 1984, Juanita Ford, a member of [Wayne's] Board of Trustees, wrote a letter to Winston Lang of the NAACP, on which she copied 17 other persons, including several state and local officials.

2. On March 20, 1984, Thomas Waters, then president of [Wayne], presented a letter to the Board which he had written to Winston Lang in response to the February 29, 1984 letter written by Juanita Ford and on which he copied the same individuals who were copied by Juanita Ford.

3. On July 1, 1984, Milan Chonich was moved from Director of Development, an exempt administrative position which had been abolished, to the union position of Associate provost at the Western Campus of the College.

4. As Director of Development, Plaintiff Chonich earned $48,495.00 per year through July, 1984. With his assignment to the Associate Provost position at the Western Campus, effective July, 1984, Plaintiff Chonich retained this salary.

5. On August 1, 1984, Plaintiff Pascaretti was assigned to the position of Acting Dean of Administration.

6. After Plaintiff Pascaretti was assigned to the position of Acting Dean of Administration on August 1, 1984, his salary remained at $54,946.00 per year.

7. Carmen Pascaretti's contract with the college was not renewed and his employment ended June 30, 1986.

8. Milan Chonich is currently Assistant Dean for Academic Affairs.

Wayne asserts that it "did not author, authorize, or ratify" Ford's February 29, 1984 letter, which is the basis of the defamation/libel claim (accusing defendants of "plotting to lay off blacks and women"), and the alleged triggering action bringing

about Wayne's purported racially-based discrimination and retaliation in replacing and removing plaintiffs from their "exempt" status. Ford claimed she was immune as a director/trustee, that she was exercising her First Amendment rights, that the letter in controversy was true, and that it represented only an expression of opinion.[2] Both defendants claimed that plaintiffs suffered no proximate damages as a consequence of their actions even if deemed defamatory, racially discriminatory, or taken in retaliation against plaintiffs for their prompt and vigorous responses to (and state lawsuit against) defendants.

## I. DEFAMATION/LIBEL CLAIM AGAINST FORD

The jury found that defendant Juanita Ford libeled both plaintiffs, but it assigned no monetary award because the "libel [was not] the proximate cause of any damage to [either] plaintiff." On appeal, plaintiffs make four arguments for reversal despite the finding of no proximate cause on libel/defamation:

1) erroneous jury instructions in failure to instruct on punitive damages;[3]

2) erroneous evidentiary rulings by the district court precluding cross-examination of defendants' witnesses on promotions and increased salaries received after Wayne's reorganization in 1986 (relating to plaintiffs' claim of loss of earnings);

3) erroneous instruction on definition of libel ("a defamation need not be 'malicious' ");

4) erroneous instruction and question to require proximate cause for damages (libel per se and presumed damages except as to claims for wages lost—actual malice).[4]

Ford's response was that "plaintiffs presented no proof whatsoever that their reputation had been in any way tarnished

---

**2.** Pretrial statement of claims and defenses.

**3.** Plaintiffs conceded, however, in their proposed instruction 24 that *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), holds punitive damages can-

not be recovered against a municipality under Section 1983.

**4.** Plaintiffs' arguments 3) and 4) are not entirely consistent; we give particular attention to argument 4).

or hurt by Ford's letter." As to claimed loss of earnings, Ford responded to plaintiffs' argument for per se or presumed damages by claiming that "neither individual had mitigated their damages," and there was "no reduction in pay" (no loss of earnings).[5] In short, Ford asserted that neither plaintiff demonstrated economic or "non-economic" damage. Further, Ford contends that plaintiffs did not preserve a "claim of error ... regarding libel and libel damages."

The district court's instruction on "libel and slander" required plaintiffs to show "actual damage" and that the letter was written with "actual malice." There was no specific objection to this instruction. Plaintiffs had requested a "libel" instruction which included the requirement that the libelous statement "had a tendency to harm the plaintiffs' reputation,"[6] and this instruction was given. The plaintiffs also requested an instruction that as a result of the libel, the plaintiffs suffered *some* damage,[7] with the burden in this respect concededly on plaintiffs. The district court, in effect, defined libel as false and malicious defamation and imposed upon plaintiffs the burden of showing "damage to reputation" and "*actual* damages which [they] suffered," rather than "*some* damage," a change from the instruction proposed by plaintiffs *and defendants.* (Emphasis in instruction added).

It does not appear that plaintiffs, in a prompt and timely manner, objected to the instructions, or lack thereof, which they now contend to be erroneous with respect to their libel claim, particularly with respect to presumed damages arising from publication of a false and malicious statement charging plaintiffs with being racists and also guilty of sexist conduct. The district court emphasized that to find Ford guilty of libel, plaintiffs were required to

show that she had acted "with knowledge that the statement was false or that she acted with reckless disregard as to whether the statement was false." Furthermore, the jury was instructed that plaintiffs had to prove, in order to prevail, that Ford was not merely giving a statement of her opinion, that she was not acting with "legislative or executive authority," and that the issuance of the letter was not a "discretionary act." There was no objection to this instruction.

■ In the absence of an express objection, we look to whether the instruction in question, in proper context, and considering the instructions in their entirety, constituted clear and prejudicial error. Plaintiffs did not request an instruction on presumed or nominal damages. Under such circumstances and in light of Fed.R.Civ.P. 51, we may consider any such error not objected to as waived, except where there is "plain error" or it "required action by the reviewing court 'in the interests of justice.'" *Batesole v. Stratford,* 505 F.2d 804, 808 (6th Cir.1974) (quoting *O'Brien v. Willys Motors, Inc.,* 385 F.2d 163 (6th Cir.1967)). *See also Ivey v. Wilson,* 832 F.2d 950, 955 (6th Cir.1987). There is a question, moreover, whether we consider even obvious and prejudicial error in a jury instruction in the absence of procedural steps, timely objections, a motion for a new trial, or any other post-judgment motion addressing this issue. *See Murphy v. Owens–Illinois, Inc.,* 779 F.2d 340, 346 (6th Cir.1985); *Wiskotoni v. Michigan Nat'l Bank–West,* 716 F.2d 378, 382 (6th Cir.1983).

■ We believe, however, that we should consider whether it was plain and prejudicial error for the court not to instruct the jury to presume or to find at least nominal damages for plaintiffs after it had first

---

**5.** Pascaretti suffered no pay reduction for two and a half years before elimination of his job in reorganization. Chonich suffered no reduction despite his administrative transfer.

**6.** Plaintiffs point out, in this regard, that the jury posed a question to the court on whether the required elements of establishing libel, included "a tendency to harm Plaintiffs' reputation and *did harm* the Plaintiffs' reputation."

(Emphasis added). The district court's response was, "yes."

**7.** Defendants' proposed instructions included similar language as to defamation, and included the "actual malice" requirement as to defendant Ford, which latter requirement the district court adopted and termed "malicious defamation."

found, as interrogatory number one was framed and defined, that Ford had intentionally uttered and published a false and malicious statement accusing defendants of racism and sexism thereby causing some "harm" or a "tendency to harm" plaintiffs' reputation. Put another way, was it legal error for the district court under such circumstances not to find, as a matter of law, that at least nominal damages were due plaintiffs? In the interests of justice, we are persuaded in this case that we should consider the libel instruction issue. We must also decide whether Michigan law presumes some damage, even if only nominal, in such a situation involving malicious and intentional libel/defamation.

Justice Potter Stewart, formerly a judge of this court, stated that a person's right to protect his good name and reputation:

> "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt v. Baer*, 383 U.S. 75, 92 [86 S.Ct. 669, 679, 15 L.Ed.2d 597] (1966) (concurring opinion).

*Quoted in Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). In *Gertz*, the Supreme Court discussed libel/defamation involving the requirement of actual malice, as a "substantial abridgement of the state law right to compensation for wrongful hurt to one's reputation...." *Id.* at 343, 94 S.Ct. at 3008. The Court noted that "one might have viewed today's decision allowing recovery under any standard save strict liability as a more generous accommodation of the state interest in comprehensive reputational injury to private individuals than the law presently affords." *Id.* at 348 n. 10, 94 S.Ct. at 3011 n. 10. At the same time, *Gertz* held "that the States may not permit recovery of presumed or punitive damages, at least, when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349, 94 S.Ct. at 3011. The jury in this case found Ford's knowledge of falsity or reckless disregard for the truth, despite her First Amendment claim, and that she was not merely stating her opinion; and defamed plaintiffs despite her claims of immunity, privilege, and performance of a "discretionary duty."

> The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred.

*Id.* This common law rule has persisted in cases where the plaintiff's suit is actionable per se and the plaintiff can show actual malice.

We are persuaded that it was plain error to tie the jury's finding of libel, as the district court defined it, to a need also to find proximate cause for there to be any award of damages to the plaintiffs.

> A defamatory publication *tends to harm the reputation* of another by lowering that person's estimation within the community or by deterring third persons from associating or dealing with him. *Nuyen v. Slater*, 372 Mich. 654, 662, 127 N.W.2d 369 (1964); *Heritage Optical Center, Inc. v. Levine*, 137 Mich.App. 793, 797, 359 N.W.2d 210 (1984).

*Michigan Microtech v. Federated Publications, Inc.*, 187 Mich.App. 178, 466 N.W.2d 717, 720 (1991) (emphasis added).

As in *Michigan Microtech*, we find the "defamatory potential of the statement" found to be libelous in this case to be "obvious." *Id.* 466 N.W.2d at 721. On the facts of this case, we find the plaintiffs' suit to be defamation per se because it relates to their business and professional reputations. As determined in *Michigan Microtech*, "presumed damages are recov-

erable where malice is shown." *Id.*, 466 N.W.2d at 722. While "special" or economic damages may not have been shown, presumed or at least nominal damages should be awarded for malicious libel. *See id.* Compare *Nisbet v. KVP–Sutherland Paper Co.*, 373 Mich. 159, 128 N.W.2d 549, 550 (1964), *with Wilkerson v. Carlo*, 101 Mich.App. 629, 300 N.W.2d 658, 659 (1980) ("defamatory statements are those which tend to harm an individual's reputation in the community. Unlike an action for tortious interference with economic relations, a defamation claim will lie even where there is no proof of any damage to the individual's business relationships or expectancies.").

We think the rule of damage is succinctly stated in 3 Restatement, Torts, § 621:

One who is liable for a libel or for a slander actionable per se is liable for harm caused thereby to the reputation of the person defamed or in the absence of proof of such harm, for the harm which normally results from such a defamation. * * * General damages are a form of compensatory damages. They are imposed for the purpose of compensating the plaintiff for the harm which the defamatory publication is proved, or, in the absence of proof, *is assumed to have caused to his reputation. It is not necessary for the plaintiff to prove any specific harm* to his reputation or any other loss caused thereby. Indeed, in many cases the effect of defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed.

*Sias v. General Motors Corporation*, 372 Mich. 542, 127 N.W.2d 357, 362 (1964) (emphasis added).

■ Ford has claimed a qualified privilege or immunity. Again, Michigan courts have spoken to this issue:

Assuming all the copies sent were privileged, that status is lost if Parsell abused the privilege by acting with common-law malice, ill will or bad faith. The Restatement of Torts (2d) suggests that, if a plaintiff proves the required constitutional actual malice necessary to have a cause of action when a public official is involved, he has, by that very action, proved that any possible qualified privilege was abused. 3 Restatement Torts, 2d § 592A, p. 259–260. The Restatement's position is logically and legally correct. Therefore, in this case, if plaintiffs proved the defendants acted with constitutional actual malice, the common-law defense of privilege would be useless.

*Postill v. Booth Newspapers, Inc.*, 118 Mich.App. 608, 325 N.W.2d 511, 517 (1982). *Postill* goes on to hold that "any common-law privilege would be destroyed if the jury found defendants acted with actual malice." *Id.* 325 N.W.2d at 518. The same rationale applies to Ford's claim of qualified immunity.

■ There was no instruction given by the district court with respect to allowable damages for harm to feelings, mental anguish, ridicule, humiliation, fear and the like. *Postill* indicates that such an instruction under the circumstances of this case would have been appropriate. *Peisner v. Detroit Free Press, Inc.*, 421 Mich. 125, 364 N.W.2d 600 (1984), indicates that under Michigan law "actual damages" include "damages suffered in respect to feelings." *Id.* 364 N.W.2d at 603. "In the libel context, actual damages for injured feelings are comparable to those attributable to the kick by the cow, *i.e.*, the plaintiff *is compensated* for injured feelings attributable simply to the *fact* and *effect* of the libel." *Id.* 364 N.W.2d at 605. *See also* 53 C.J.S. *Libel and Slander* § 188 (1987).

In summary, we conclude that it was plain and prejudicial error to require plaintiffs to establish a proximate cause connection for allowance of at least nominal damages to their feelings and reputation by reason of what the jury determined, based on adequate evidence, was malicious libel/defamation by Ford. Michigan law, common-law, and Restatement of Torts are in agreement on that principle. We, therefore, in the interests of justice, and despite plaintiffs' failure to object or call this law

to the district court's attention in a timely manner, REVERSE the judgment for defendant Ford in this respect and award each plaintiff the nominal sum of $1.00 each against the defendant Ford for libel/defamation.

We hold, as a matter of law, that it was erroneous to condition *any* recovery of damages to plaintiffs for malicious libel upon a proximate cause requirement of proving consequential damages. There was a failure to instruct the jury on a finding of malicious libel as to injury to reputation, mental distress, as well as feelings, humiliation and fear. Insofar as the jury held that the libel was not a proximate cause of specific economic damages or punitive damages, however, we do not disturb this determination.

## II. WAS FORD'S LIBEL ATTRIBUTABLE TO WAYNE?

We have determined that there was sufficient evidence for the jury to determine that Ford had, with actual malice, libelled plaintiffs and that they were entitled to nominal damages against her regardless of proximate causation. The district court inquired of the jury whether defendant Ford was acting as an agent for Wayne at the time she libelled plaintiffs. In view of the jury's award of no damages for the Ford libel, it was not called upon to answer this question. The district court did instruct the jury that:

> You may find the college liable for libel if the statement was made by Mrs. Ford while she was in discharge of her duties as agent of the college and in relation to a matter about which her duty as an agent permitted or required her to act, in the same way and to the same extent as Mrs. Ford could be held liable.

Wayne's attorney argued to the district court that our previous remand required the district "Court to make a determination as a matter of law on the questions of agency and the employer relationship," conceding that when Ford issued the letter she was a member of the Wayne Board of Trustees and Secretary of the Board. The

district court denied Wayne's motion for summary judgment in this regard and properly so, we believe, prior to trial. It made no express legal determination on the "agency" and "employer relationship" questions.

Wayne's appellate brief states that the jury instruction relating to its liability for libel, if any, was correct and based upon *Poledna v. Bendix Aviation Corp.*, 360 Mich. 129, 103 N.W.2d 789 (1960). Wayne also implicitly recognizes that *Sias* holds that a separate entity may be liable for slanderous/libelous statements made by its employee. It argues that it may be held liable only "if it was [sic] demonstrated in some way that the letter was an act of the college," but asserts that in respect to the letter, she was not "doing something pursuant to Board mandate or authority." Plaintiffs conceded before the district court that Ford was not an employee of Wayne.

We conclude that on this issue we must again REMAND to the district court for a determination "as to Wayne's liability," if any, along with co-defendant Ford, for libel. If liable for defamation/libel, the damages would be the same as to each defendant.

## III. LIABILITY UNDER 42 U.S.C. SECTION 1983

Plaintiffs dismissed their Title VII claims and pursued instead their claim for racial discrimination against Wayne under § 1983. The jury decided that Wayne neither denied plaintiffs' civil rights nor discriminated against either of them "because of race." As noted, defendants produced considerable additional evidence at the second trial with respect to § 1983 and the Michigan Civil Rights Act claims based upon racial discrimination and retaliation.

We must first decide whether defendant Wayne was entitled to a new trial with respect to liability on the discrimination and retaliation claims in light of our prior remand:

> The instructions given by the court on the claim of discrimination do not mention "official policy" or "custom and

practice," or actions sanctioned, adopted, approved, or authorized by Wayne through its responsible officials or Board. The district court deemed, under the proof, that actions taken by or involving the presidents of the College and its directors of personnel were official and sanctioned actions of Wayne; they were Wayne "personified."

Michigan courts have expressly relied on federal precedent regarding proof of employment discrimination for purposes of the Elliott–Larsen Civil Rights Act. *Jenkins v. Southeastern Michigan Chapter, American Red Cross*, 141 Mich.App. 785, 369 N.W.2d 223, 237 n. 2 (1985). Elliott–Larsen provides a cause of action for retaliation following the filing of a discrimination claim, while it may be questionable that § 1983 creates a substantive right against such retaliation. *See Day v. Wayne County Board of Auditors*, 749 F.2d 1199 (6th Cir.1984). Wayne argues therefore that separate instructions on the two parallel but different causes of action should have been given. The district court also did not use separate instructions for the federal and the state claims of employment discrimination.

We are troubled by the district court's failure to set out in its instructions the specifics of the § 1983 claim as to "official policy" requirements and to distinguish the § 1983 from the Elliott–Larsen claim with regard to respondeat superior and to certain important particulars. To sustain the jury verdict for plaintiffs we would have to conclude that it necessarily incorporates a finding that defendant Wayne, through its responsible officials and agents, rejected plaintiffs as administrators and faculty members because of their race, and that defendant Wayne failed to produce satisfactory economic or academic reasons for its alleged discriminatory actions. It is a close and difficult question that there was a basis for a judgment for plaintiffs against Wayne because of its demotion and dis-

charge for racial reasons under § 1983 and/or under Elliott–Larsen. *See Pembaur [v. City of Cincinnati*, 475 U.S. 469, 89 L.Ed.2d 452 1986], *supra; Gilmere v. City of Atlanta*, 737 F.2d 894, 902 n. 22 (11th Cir.1984); *Ponton v. Newport News School Board*, 632 F.Supp. 1056 (E.D.Va.1986). We also note particularly the Court's recent decision of *City of Canton v. Harris*, [489] U.S. [378], 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) citing approvingly an earlier remand by this court of a § 1983 case because the jury instruction "might have led the jury to believe that it could find against the city on a mere *respondeat superior* theory." *Id.* at [383], 109 S.Ct. at 1201. Therefore, we REMAND the case to the district court for further consideration as to whether a new trial on these liability issues is required because of the absence of *Monell* instructions.

*Chonich I*, 874 F.2d at 367.

The district court interpreted our remand as mandating a new trial, not just on damages, but on the issue of liability. Judge Gilmore stated, "as far as I am concerned, there is going to be a new trial so I don't think we have to waste any time on that."[8] Wayne's counsel understandably responded, "I am quite content with that." Plaintiffs' counsel, surprisingly, made no objection to the district court's ruling.

■ The plaintiffs now allege that it was error to deprive them of the earlier, favorable jury verdict. They take the position that there has never been a *Monell* issue in this case, and therefore a new trial on liability was not required. Plaintiffs argue that our concern in *Chonich I* "was misplaced, and served to deprive the Plaintiffs of a substantial and properly arrived at verdict." They argue that "throughout ... [Wayne] is the Defendant against whom its [sic] charges have been brought, since it was the College that acted wrongfully against them, not lower level administrators." (*"The governmental entity itself."*) Plaintiffs concede that "its governing

---

**8.** The district court later added, before hearing from plaintiffs' counsel, "we will have a full trial. So address the other issues here ... [summary judgment motion on defamation and to amend the pleadings]."

board is indeed the personification of the institution and it was and is only the actions of the Board of which Plaintiffs have complained." Plaintiffs, however, filed no motion to rehear, to reconsider, or to clarify *Chonich I.* As heretofore pointed out at the hearing before the district court, after remand, on Wayne's motion for a new trial, plaintiffs did not press this position. We made the following additional observations in *Chonich I* with respect to the Board's role in the failure to transfer Chonich to the Wayne faculty:

> Dr. Waters was not named by plaintiffs as a party defendant. Chonich claims that he sought to transfer to a faculty position in 1984, which involved potentially higher pay, but it seems doubtful that the Board of Wayne itself acted on the 1984 request made to Waters for transfer. Dr. Waters did submit the request of plaintiff in a communication dated July 2, 1984, dealing with personnel reassignments to "all college personnel," but it is unclear as to whether the Board was included or whether the Board itself acted. Dr. Waters stated that Chonich's request for faculty status would be recommended and submitted to the Board at the "next meeting."

*Chonich I,* 874 F.2d at 369–70.

This court's assessment of the situation and its doubts about the role of the Board in that regard were not challenged by plaintiffs. The plaintiffs did not file motions for reconsideration or rehearing in *Chonich I.* At the second trial, Chonich indicated that his only source of information about this issue was Dr. Waters' advice that he would not be transferred because he was a political liability due to Ford's letter, and he had no factual basis to assume that the board of trustees would not approve his request to transfer to the faculty. Plaintiffs also unsuccessfully requested Dr. Temple, Waters' successor as president, to transfer them to faculty. Plaintiffs, however, have not sued for breach of contract in this regard, nor has Chonich filed any subsequent grievance concerning this issue. Pascaretti filed a grievance and was advised that his contract gave him no right to transfer to the faculty. Pascaretti's testimony at the second trial was that Waters told him approval would not be forthcoming from the board for a transfer, and he did not present his request to the board.

We recite these matters because we believe that plaintiffs have waived their right to complain about the circumstances and propriety of our prior remand under the law of the case doctrine. They could have, of course, and should have, pressed their contention that a new trial was not mandated before the district court.

In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611] (1978), we decided that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983. *Id.* at 694–695 [98 S.Ct. at 2037–2038]. "It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *Springfield v. Kibbe,* 480 U.S. 257, 267 [107 S.Ct. 1114, 1119, 94 L.Ed.2d 293] (1987) (O'Connor, J., dissenting) (quoting *Monell, supra,* [436 U.S.], at 694 [98 S.Ct. at 2038]).

Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. The inquiry is a difficult one....

*City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).

We had concern as to whether the jury in *Chonich I* might have believed that Wayne was liable, under principles of respondeat superior, for possible or potential unauthorized or *ultra vires* acts of the presidents of the college, when plaintiffs themselves concede that the actions of the board of trustees itself were the ones at issue. The board sets the policy, makes the final decisions, and establishes custom or practice for employment determinations for high ad-

ministrative personnel, such as Chonich and Pascaretti. Instructions to the jury should make this clear in a case charging Wayne with racial discrimination and retaliation based on racial considerations.

In the second trial, the subject of this appeal, the district court instructed that Wayne might be liable for discrimination and/or retaliation as "the result of the official policy or custom of the college or where the acts were officially sanctioned or ordered by the college." The court amplified to the jury,

> you must assess whether the college discriminated against the Plaintiffs on the basis of their race through some official act, custom or policy, or whether discrimination occurred by individuals who were acting as agents of the college at the time ... acting within their authority intentionally discriminated against them because of their race.

 Although the district court did not give reasons for its decision to grant Wayne a new trial and should have afforded plaintiffs' counsel adequate opportunity to argue this motion, we hold that under all the circumstances a new trial was appropriate. We assume that the district court fully considered plaintiffs' response to the motion, which argued that "respondeat superior has never been an issue in this case." Plaintiffs' response to the motion for a new trial, moreover, refers to Waters' actions and his alleged informal polling of the board while at the same time conceding "that it is the Board who has the ultimate authority to hire, fire, and re-assign personnel." They later assert in this same response that "Dr. Temple was the direct instrument of the Board in discriminating against Plaintiffs." They make reference to *Monell:*

> The test of their [Wayne's] liability is intentional "constitutional deprivations visited pursuant to governmental 'custom' " as well as deprivations visited pur-

suant to "policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers. *Monell v. Department of Social Services,* 426 [436] U.S. 658 (1978) at 690–91 [98 S.Ct. 2018 at 2035–36, 56 L.Ed.2d 611]."

The question presented on Wayne's liability under *Monell* and its progeny, we believe, was whether it *officially* discriminated through its board, not whether the board was simply "aware" or "cognizant" of actions being taken with regard to plaintiffs, as plaintiffs argued, in their response to the district court.[9]

Reiterating what we said in *Chonich I,* this issue represents "a close and difficult question," but we AFFIRM the district court's judgment for defendant Wayne on the § 1983 claim. We recognize plaintiffs' difficulty with this result after having obtained a very substantial judgment on this issue in the first trial. We find no merit in plaintiffs' other contentions addressing the district court's actions as to the § 1983 claims, including jury instructions and submission of jury interrogatories.

Our discussion with respect to alleged race discrimination under 42 U.S.C. § 1983 applies to the Fourteenth Amendment claim asserting a violation of equal protection for racial reasons against Wayne.

## IV. LIABILITY UNDER MICHIGAN CIVIL RIGHTS ACT

The jury responded to specific interrogatories (called the "jury roll") on the issue of Wayne's liability under Michigan law for alleged racial discrimination and retaliation. It found that Wayne denied neither plaintiff his civil rights (question 8) nor discriminated against either "because of his race" (question 9). The jury then found that Wayne "did retaliate" against both "by taking ... adverse action ... because [they] filed this lawsuit" (after March 15, 1985). Michigan's law proscribes retalia-

---

9. Nor was the proper issue, as argued by plaintiffs in the same response to defendant Wayne's motion, whether "activities" of certain Wayne officials or board members were "correctable" by the board of trustees. At least, it was for the jury to determine, properly instructed, whether intentionally discriminatory actions were taken by Wayne through an authorized, official policymaker. *See EEOC v. Board of Trustees of Wayne County Community College,* 723 F.2d 509 (6th Cir.1983).

tion or discrimination against a person "because the person has opposed a violation of this act, or because the person has made a charge, [or] filed a complaint...." Mich. Stat.Ann. § 3.548(701) [M.C.L.A. § 37.-2701]. The retaliation charge was made under the Michigan Act, not a federal civil rights act.

The district court instructed the jury, and we find no error in these instructions, that to find retaliation under the state law it must find, after the filing of this lawsuit, that Wayne acted against plaintiffs "through some sort of adverse job consequence," and that the filing was the "likely reason for any adverse conduct or consequence." Under the statute, retaliation is the wrongful consequence imposed upon a person for pursuing a claim of employment discrimination. This is similar to retaliation under Title VII and the "standard[ ] of liability ... appear[s] to be identical." *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1014 (6th Cir.1987) (citing *Jenkins v. Southeastern Mich. Chapter, Amer. Red Cross*, 141 Mich.App. 785, 369 N.W.2d 223, 227 n. 2 (1985); *Clark v. Uniroyal Corp.*, 119 Mich.App. 820, 327 N.W.2d 372, 374 (1982)).

■ Under Michigan law, however, unlike Title VII retaliation, there may be a recovery for discrimination or retaliation related thereto: "It is well established that victims of discrimination may recover for humiliation, embarrassment, outrage, disappointment and other forms of mental anguish...." *Jenkins*, 369 N.W.2d at 230. The jury found the retaliatory actions, arising out of racial discrimination claims, were not the proximate cause of damages. While giving a general damages instruction on all causes of action, the district court did not instruct the jury specifically as to the nature of mental and personal embarrassment elements of retaliation damages under Michigan law. The jury's decision not to award any damages under the circumstances, once it had found "some sort of adverse job consequence" due to the filing of this suit, is inconsistent and seems unjust, particularly since the court failed to apprise the jury specifically of non-econom-

ic (emotional) consequences that might be attributable to the retaliation. While we do not adopt a rule requiring a separate recitation of the elements of damages as to each claim in a jury instruction, a complicated and complex case of this kind indicates that the jury may have been confused about the relationship between this particular claim and the emotional injury aspect of damages on the other causes of action. There is some question also concerning when the retaliation took place and when, at the earliest, it may have commenced. We find that plaintiffs' failure to object to the instruction as to the time frame (March 15, 1985), present also in the jury interrogatory, precludes our setting aside the jury decision on no damages with respect to the use of this date as a beginning point for retaliation.

■ On the other hand, we believe it appropriate to remand, in the interests of justice, although we dislike the prospect of a second remand in this case on a damages issue, for a new trial on the issue of non-economic damages resulting from retaliation. On remand, the district court should give a specific retaliation instruction dealing with "humiliation, embarrassment, outrage, disappointment and other forms of mental anguish ...," particularly since the retaliation arose following a finding of a false and malicious libel by Ford who allegedly was acting with the authority of defendant Wayne.

Elliott–Larsen forbids retaliation or discrimination against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich.Comp.Laws § 37–2701(a). It was enacted some ten years subsequent to Title VII and was intended to provide similar protections. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1311 (6th Cir.1989). Michigan courts look to Title VII in order to resolve questions under Elliott–Larsen, and section 37.201 at issue here clearly tracks section 704(a) of Title VII, 42 U.S.C. § 2000e–3. *Booker*, 879 F.2d at 1311–12. Thus, sec-

tion 37.2701 should be construed in the same manner as its federal counterpart. *Id.* at 1312.

*Johnson v. Honeywell Info. Sys., Inc.,* 955 F.2d 409, 415 n. 1 (6th Cir.1992).

As we have indicated, the Elliott–Larsen Act concept of retaliation is intended to provide protection and relief in the employment context above and beyond damages for retaliation under Title VII; the elements of a finding of substantive retaliation under Title VII have, until 1991, brought about only affirmative forms of equitable relief for the offended plaintiffs.[10] The Michigan law, to the contrary, grants a jury trial and damages for mental and emotional distress brought about by retaliation.[11] On remand, the district court may conclude that in any event plaintiffs are entitled to at least nominal damages for the retaliation found on the part of Wayne, although the verdict would deny any economic damages, as such. We AFFIRM the verdicts against both plaintiffs for Wayne as to *economic* damages for retaliation.

### V. EMOTIONAL DISTRESS

We find no error in respect to the verdict and judgment for Wayne with regard to plaintiffs' claims of severe emotional distress intentionally inflicted upon them. In affirming these judgments, we also conclude that these judgments for defendant Wayne do not preclude an award to plaintiffs, as discussed in part IV hereinabove, for mental anguish and emotional components for damages for retaliation.

### VI. COSTS AND ATTORNEY FEES

#### A. *AGAINST DEFENDANT FORD*

In light of our decision in part I of this opinion awarding plaintiffs nominal dam-

---

**10.** The 1991 amendment to Title VII changes the concept of denying damages except for back pay and specific forms of equitable relief.

**11.** In *Lilley v. BTM Corp.,* 958 F.2d 746, 754 (6th Cir.1992), we held: "The recovery of mental anguish damages is permitted under the Elliott–Larsen Act. *Slayton v. Michigan Host,* 122 Mich.App. 411, 417, 332 N.W.2d 498 (1983)." The jury awarded plaintiff Lilley $350,000 for mental anguish in connection with a termination. The *Lilley* case added:

ages for libel against defendant Ford, we REMAND this case to the district court for a determination as to the proper amount of costs to which plaintiffs are adjudged to be entitled against Ford. As to attorney fees, we REMAND this question of plaintiffs' entitlement to attorney fees against Ford based on malicious libel/slander. We believe the district court is the proper tribunal to determine whether such fees are allowable under Michigan law, and, if so, in what amount. Fees and costs should be allocated in this regard to the defamation aspect of the case.

#### B. *AGAINST DEFENDANT WAYNE*

We have remanded for district court determination the question of Wayne's liability, if any, for the libel committed by the secretary of its board of trustees. If Wayne is ultimately determined to be held liable to plaintiffs on this account, the district court will determine also its liability for costs and attorney fees, if any.

With respect to the issue of retaliation discussed in part IV, we also REMAND to the district court the determination of costs, if any, to be assessed against Wayne for retaliation under the Michigan act.

[T]he Elliott–Larsen Civil Rights Act. M.C.L. § 37.2802; M.S.A. § 3.548(802) provides:

"A court, in rendering a judgment in an action brought pursuant to this article, may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant in the action if the court determines that the award is appropriate."

[T]he Elliott–Larsen Act permits recovery of prejudgment interest from the date the complaint is filed. Mich.Comp.Laws § 600.6013 (providing prejudgment interest on all damage recoveries in civil actions). *Brunson v. E & L Transport Co.,* 177 Mich.App. 95, 97, 441 N.W.2d 48 (1989) (applying prejudgment interest from date of complaint to date of recovery under Elliott–Larsen Act).

The decision to grant or deny an award of attorney fees under the section is discretionary with the trial court. *King v. General Motors Corp.*, 136 Mich.App. 301, 308, 356 N.W.2d 626 (1984). The purpose of the provision is to encourage persons deprived of their civil rights to seek legal redress, to ensure victims of employment discrimination access to the courts, and to obtain compliance with the act and thereby deter discrimination in the work force. *King, supra,* p. 307–308, 356 N.W.2d 626.

*Jenkins,* 369 N.W.2d at 231.[12]

If plaintiffs are found entitled to at least nominal damages under Michigan law for retaliation under the circumstances of this case, the district court, on remand, must determine the costs and attorney fees, if any, that are properly assessed against Wayne.

> Victory in civil rights litigation is not always measurable in ordinary economic terms. As a plurality of the Court opined in *City of Riverside v. Rivera,* [477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)].... "Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards."

*Romberg v. Nichols,* 970 F.2d 512, 519 (9th Cir.1992).

This has been a difficult case, we recognize, for the district court, as well as this court. We are reluctant to remand any issues for a second time, but feel compelled, in the interests of justice, to reach the decisions involving remand and reconsideration for the reasons stated.

We AFFIRM the judgment for defendants on emotional distress. We REVERSE the award of no damages to either plaintiff as to defendant Ford on the libel issue, and REMAND for further proceedings as to liability of defendant Wayne in this regard. We AFFIRM the judgment for defendant Wayne on civil rights liability

under 42 U.S.C. § 1983. We REMAND on the issue of liability for non-economic damages against Wayne for retaliation under Michigan law. We AFFIRM, however, the judgment for defendant Wayne on the issue of economic damages for retaliation.

Finally,[13] we REMAND for a determination of costs, and for attorney fees, if any, against the defendants in accord with the principles herein set forth. Fees and costs allowed should be limited to those areas in which plaintiffs were prevailing parties.

---

12. *See also Riethmiller v. Blue Cross and Blue Shield,* 151 Mich.App. 188, 390 N.W.2d 227, 234 (1986).

13. The plaintiffs argued that Judge Gilmore's trial conduct was so prejudicial as to warrant a

new trial. After careful consideration, we determine that any trial errors, not discussed in this opinion, do not rise to the level of prejudice which mandates a new trial on all issues.