**Stanley HOLLAR, Plaintiff–Appellant,**

v.

**Lisa CAIN, M.D., Individually and in her capacity as agent, servant or employee of Ashland Emergency Medical Associates, PSC; Ashland Emergency Medical Associates, PSC; Ashland Hospital Corporation, doing business as King's Daughters Medical Center; Robert Love, M.D., PSC, in his capacity as agent, servant or employee of Ashland Hospital Corporation Defendants–Appellees.**

No. 00–5737.

United States Court of Appeals,
Sixth Circuit.

June 11, 2002.

Before KRUPANSKY and BOGGS, Circuit Judges, and LAWSON, District Judge.[*]

KRUPANSKY, Circuit Judge.

In this diversity medical malpractice action, the plaintiff-appellant Stanley Hollar ("Hollar") has contested the trial court's final judgment in favor of all defendants. On review, he has charged that the district judge improperly directed a verdict for certain defendants, and that alleged trial errors tainted the jury verdict in favor of the remaining defendants. He has requested a new trial against all defendants.

On the evening of Wednesday, January 31, 1996, Hollar, then a twenty-year-old student at Kentucky Christian College, was playing "goalie" in an indoor intramural soccer match. As the over–450–pound youth attempted to block an adversary's shot intended for the goal, his right leg collapsed under him, causing intense pain. Paramedics rushed Hollar by ambulance to King's Daughter's Medical Center

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

("KDMC"), a facility owned and operated by defendant Ashland Hospital Corporation in Ashland, Kentucky. Following initial examinations by two emergency room nurses, which produced normal "pedal pulse" readings for each of the patient's feet,[1] defendant Lisa Cain, M.D. ("Dr. Cain"), a certified emergency room specialist, performed a complete physical examination upon the injured student. She detected approximately equivalent pulses in each foot; normal skin color and body temperature; no deformity of the right knee; and normal motor and sensory functions, including the subject's ability to volitionally move his wounded right leg. Negative x-ray results indicated that the victim had sustained no bone fractures. However, Dr. Cain's motion tests disclosed abnormal movements within Hollar's right knee joint indicative of trauma to the anterior cruciate ligament ("ACL") and the medial collateral ligament ("MCL"). Accordingly, Dr. Cain advised the plaintiff that he had suffered torn knee ligaments, or, in common parlance, a "sprained knee."

Under KDMC's established policies and practices, a knee sprain did not justify a hospital admission. However, Dr. Cain favored allowing Hollar a short "social admission," because she perceived that he would require temporary assistance with personal needs such as ambulation to the wash room. However, because KDMC did not employ Dr. Cain, but instead retained her services via a contractual arrangement with her employer, defendant Ashland Emergency Medical Associates, P.S.C., Dr. Cain lacked authority to admit any patient to KDMC. Thus, in accordance with KDMC's standard practices and proce-

dures, she telephoned KDMC's on-call certified orthopedic surgeon, defendant Robert Love, M.D. ("Dr.Love").[2] Dr. Cain explained Hollar's predicament, specifically that his sprained right knee temporarily immobilized him, given his atypical physical bulk. She requested permission to authorize his social admission. In response to Dr. Love's inquiries, Dr. Cain disclosed that several of Hollar's dormitory schoolmates who had accompanied him to the hospital had volunteered to assist with his personal needs. Ultimately, Dr. Love and Dr. Cain agreed that, under the totality of the circumstances, KDMC's policies disallowed Hollar's admission.

Subsequent to that telephone conference, Dr. Cain released Hollar, but instructed him to return to KDMC immediately if his condition deteriorated. Furthermore, in accordance with Dr. Love's directions, she instructed Hollar to schedule a diagnostic appointment with Dr. Love for the upcoming Monday, February 5, 1996. Thereafter, an emergency room nurse applied a "knee immobilizer" (or splint) to the patient's right knee, and once again verified the normality of his pedal pulses. Finally, the discharge nurse checked Hollar's blood pressure and pulses, which were normal; instructed him concerning the application and maintenance of his knee splint; and, per Dr. Cain's orders, dispensed a prescription analgesic together with written instructions regarding its use.

Hollar returned to his campus domicile during the early morning of Thursday, February 1, 1996. Later that same day, a classmate alerted Dr. Cain, via a recorded telephone message, that Hollar had been

---

**1.** A normal pulse in a subject's foot evidences normal circulation in the corresponding leg.

**2.** Dr. Love has insisted that the plaintiff failed to name him as an individual party defendant, but rather had sued only his professional ser-

vice corporation, denominated "Robert Love, M.D., P.S.C.." However, the distinction is immaterial to this reviewing court's disposition of the instant case, as developed herein.

unable to ambulate to the lavatory; his friends had assisted him by conveying him to and fro while seated in a wheeled office chair. Upon retrieving that message, Dr. Cain contacted Hollar by telephone. The plaintiff told the doctor that he had not taken any of the analgesics supplied to him because he had not experienced significant pain, but that he was "afraid to stand on his [injured] leg." Subsequently, Dr. Cain again contacted Dr. Love. She reported that Hollar required personal assistance because he resisted bearing weight on his traumatized limb. She renewed her "social admission" recommendation. Suspecting that the patient might require surgery, Dr. Love advised that Hollar should consult with Dr. George Aitken ("Dr.Aitken"), a practicing orthopedic surgeon. Dr. Love concluded that Dr. Aitken should determine if the patient required surgery and/or hospital admission.

Dr. Cain then telephoned Dr. Aitken, who concurred with Dr. Love's assessment that the patient should not be admitted to the hospital for a sprained knee, but that he should be examined further. Dr. Aitken agreed to examine Hollar in the KDMC emergency room the following morning, Friday, February 2, 1996, at 10:00 a.m.. Dr. Cain then immediately called Hollar to advise him of that appointment.

However, without explanation, Hollar failed to appear at KDMC on February 2. Likewise, Hollar neither honored, nor canceled, his appointment with Dr. Love slated for Monday, February 5. Instead, on Saturday, February 3, 1996, Hollar's immediate relatives retrieved him from his dorm room and returned him to his family residence in Indiana. Excepting only his initial visit to KDMC on January 31/February 1, 1996, Hollar sought no medical attention until Tuesday, February 6, 1996, when he visited an orthopedic specialist, Dr. Lindsey Rolston ("Dr.Rolston"), at

Rush Memorial Hospital ("RMH") in Rushville, Indiana. Hollar reported, for the first time to any medical care provider, that he was currently experiencing no sensation in his right leg. Dr. Rolston's subsequent examination disclosed that, following the removal of the subject's knee splint, normal dermal color and temperature rapidly returned to the injured area. Dr. Rolston detected approximately equivalent pedal pulses in each foot. The patient exhibited normal motor and sensory responses, and displayed no indicia of vascular or bone damage. Dr. Rolston concluded that Hollar had suffered a sprained knee, and that his immobilizer had previously been fastened too tightly. The physician prescribed physical therapy, but instructed the patient to return immediately to the emergency room if his condition changed.

As directed by Dr. Rolston, Hollar initially reported to RMH physical therapist Lisa Dube ("Dube") on Thursday, February 8, 1996. Unlike every examining health care service provider who had preceded her, Dube failed to detect any pedal pulse in Hollar's right foot. Her therapy record revealed that the patient's right leg was cold, discolored, and apparently gangrenous. Nevertheless, Dube neither advised Hollar that he should immediately seek a physician's attention, nor did she inform Dr. Rolston of Hollar's exhibited indicia of serious vascular damage. Instead, Hollar returned to her for additional physical therapy the following day, Friday, February 9, 1996. Dube's recorded observations were substantially identical to those of the preceding day, but still she neglected to advise him to see a physician, or to alert Dr. Rolston of the young man's deteriorated condition.

Two days later, on Sunday, February 11, 1996, at approximately 6:00 p.m., Hollar experienced a "throbbing sensation"

around his right knee. At approximately 11:00 p.m., the mounting pain became unbearable, and the subject's right foot had become alarmingly darkened and frigid. Upon his arrival at RMH shortly thereafter, an examination using a Doppler stethoscope disclosed that Hollar had no pulse in his right foot. The examining physician arranged for his immediate transit by ambulance to Methodist Hospital in Indianapolis for surgery. At Methodist Hospital, a vascular surgeon, Dr. Gilbert T. Herod ("Dr.Herod"), diagnosed an obstruction of the patient's right popliteal artery. The following day, February 12, 1996, Dr. Herod, with the assistance of an orthopedic surgeon, Dr. David M. Kaehr ("Dr. Kaehr"), operated on Hollar's right leg to relieve the obstruction. However, they discovered that Hollar's popliteal artery had ruptured, which tragically caused the mortification of much of his lower right leg. Unable to salvage it, the same surgical team, on February 14, 1996, amputated Hollar's right extremity at the knee.

On January 24, 1997, Hollar, an Indiana resident, instituted, in the United States District Court for the Eastern District of Kentucky, a diversity medical malpractice complaint against the Kentucky defendants, whereby he sought actual monetary damages in excess of $78,838.86. *See* 28 U.S.C. § 1332(a)(1). In any diversity case, a federal court applies the substantive law of the forum state. *United States v. Anderson County, Tenn.*, 761 F.2d 1169, 1173 (6th Cir.1985). By contrast, federal law governs procedural questions, including the admissibility of evidence. *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir.2000). In Kentucky, a medical malpractice plaintiff must prove, typically via competent expert testimony, that (1) the defendant medical service provider's actions had *failed to satisfy the generally accepted professional standard of care and competence* expected of the class of physicians, other healing arts professionals, or care-givers to which the defendant belongs; and (2) that such negligence *proximately caused* the plaintiff's injury. *Blair v. Eblen*, 461 S.W.2d 370, 372–73 (Ky.1970); *Harmon v. Rust*, 420 S.W.2d 563, 564 (Ky.1967); *Morris v. Hoffman*, 551 S.W.2d 8, 9 (Ky.Ct.App.1977).

Hollar's case proceeded to trial in April 2000. At the close of his case-in-chief, the district court granted a directed verdict in favor of Dr. Love and his professional service corporation, plus a partial directed verdict for KDMC to the extent that Hollar had alleged negligence on the part of its emergency room nurses. A federal court sitting in diversity must apply the forum state's law governing directed verdicts. *Arms v. State Farm Fire and Casualty Co.*, 731 F.2d 1245, 1248 (6th Cir. 1984). "Under Kentucky law, a directed verdict is appropriate when, drawing all inferences in favor of the nonmoving party, a reasonable jury could only conclude that the moving party was entitled to a verdict." *Buchholtz v. Dugan*, 977 S.W.2d 24, 26 (Ky.Ct.App.1998).

In the case *sub judice*, the plaintiff failed to show that Dr. Love had taken any action which failed to satisfy the prevailing standard of care and competence expected of a Kentucky hospital emergency department's on-call orthopedist. Indeed, although the plaintiff offered the testimony of four purported expert medical witnesses at trial, none attested to the governing Kentucky standard of care and competence applicable to an orthopedist under *any* circumstances. To the contrary, the sole expert orthopedic surgeon produced by the plaintiff, Dr. Victor Parisien, testified via videotaped deposition that he could not fault any case-pertinent action taken by Dr. Love. Consequently, no evidence of record could have supported a finding by

the jurors that, under the implicated circumstances, Dr. Love had breached an unknown standard of care and competence applicable to Kentucky orthopedic surgeons. Accordingly, a directed verdict for Dr. Love and his professional service corporation, on the subject record, was mandatory.

■ Likewise, the plaintiff failed to introduce sufficient evidence from which the jury could have discerned the Kentucky standard of care and competence controlling the activities of emergency room nurses. The plaintiff proffered only speculation by Dr. Robert Mouser ("Dr.Mouser"), a family practitioner who possessed no current expert credentials in the field of Kentucky emergency room nursing standards and practices, to the effect that, if Hollar's arterial transection had existed at the time of his January 31/February 1, 1996 visit to KDMC, the emergency room nurses might have detected it if they had used a Doppler stethoscope to test the patient's pedal pulses. However, Dr. Mouser offered no competent expert testimony upon which the jury could have concluded that the KDMC nurses had violated the prevailing Kentucky standard of care and competence in their examinations of Hollar, especially in light of the testimony of the plaintiff's own vascular surgery expert witness, Dr. Daniel LeGrand ("Dr.LeGrand"), that when a medical examiner detects a pedal pulse in a damaged limb, due care does *not* require the use of a Doppler stethoscope. Dr. LeGrand further opined that he could not fault the examinations and care furnished to Hollar by the KDMC emergency room nurses. Accordingly, the lower court correctly awarded the partial directed verdict for KDMC.

Next, the plaintiff has assailed the jury verdict favorable to the remaining three defendants (Dr. Cain, her employer Ashland Emergency Medical Associates, P.S.C., and KDMC on a *respondeat superior* theory as the entity for whom Dr. Cain had contractually rendered her medical services in controversy) by charging that the presiding trial jurist had committed allegedly prejudicial errors in a jury instruction and a juror interrogatory, and in three evidentiary rulings.

Hollar has protested that the district judge erroneously charged the jurors that "it was the duty of the Plaintiff, Stanley Hollar, to exercise ordinary care[3] for his own safety in timely seeking medical treatment and in following the advice of his physicians." (Instruction No. 9, "Duty of Stanley Hollar"). Because the plaintiff failed to object to that part of the subject "comparative negligence" instruction during the trial court proceedings, he has forfeited his opposition, unless he could demonstrate "plain error"—that is, error which, at minimum, was both obvious and prejudicial—in that charge. *Chonich v. Wayne County Community College*, 973 F.2d 1271, 1275 (6th Cir.1992). However, no legal error inhered in that instruction, because Kentucky law provides that every tort plaintiff has a duty to exercise ordinary care to protect his own safety. *See* Ky.Rev.Stat. 411.182; *Smith v. Collins*, 277 S.W.2d 38, 42 (Ky.1955); *Geyer v. Mankin*, 984 S.W.2d 104, 107 (Ky.Ct.App. 1998). Moreover, even if error had contaminated that belatedly-faulted instruction, it would have been harmless, because by its terms the charge applied *only if* the jurors had preliminarily concluded that defendants Dr. Cain and Ashland Emergency Medical Associates, P.S.C., had breached a duty of care owed to the plaintiff. Be-

**3.** Instruction No. 10 defined "ordinary care" to be "such care as the jury would expect an ordinarily prudent person to exercise under similar circumstances."

cause the jury found, in response to Special Interrogatory No. 1, that those defendants had *not* breached any duty owed to Hollar, no contingent material fact issue arose concerning the degree of Hollar's injury-causing fault relative to that of any defendant.

Concordantly, the plaintiff's assault against the trial court's references to the actions of non-litigants Dr. Rolston, Lisa Dube, and RMH (collectively referred to hereinafter as "the Indiana health care providers") within Special Interrogatory No. 3 and the comparative fault charge (Instruction No. 9) was also misconceived. Hollar has claimed that the district court erred to his prejudice by asking the jurors to determine whether the absent-from-trial Indiana health care providers had breached any duty of care owed to the plaintiff by which they had contributed to his subject injury (Special Interrogatory No. 3); and, if so, to assess the relative fault of those non-parties vis-a-vis the defendants and the plaintiff (Instruction No. 9).

Although the Indiana health care providers were not initially joined as parties defendant in this case, the defendants impleaded them as third-party defendants pursuant to Fed.R.Civ.P. 14, thereby enabling the defendants, as third-party plaintiffs, to seek indemnification or contribution from the Indiana health care providers for any monetary damages which might be awarded to the plaintiff. Thereafter, Hollar sought leave to amend his complaint to assert direct claims against the Indiana health care providers. The trial court denied Hollar's motion because his requested amendment would have destroyed the federal court's diversity jurisdiction. *See Caterpillar, Inc. v. Lewis,* 519 U.S. 61, 66 n. 1, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996); *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98

S.Ct. 2396, 57 L.Ed.2d 274 (1978). Further, the district judge dismissed the Indiana health care providers as parties to the subject litigation, because "Indiana does not recognize actions for contribution among joint tortfeasors," and therefore the defendants' third-party complaint against them could not stand. *Consolidated Rail Corp. v. Allied Corp.,* 882 F.2d 254, 258 (7th Cir.1989) (citations to Indiana precedents omitted).

■ Nonetheless, irrespective of the pre-trial dismissal of the Indiana health care providers, the lower court correctly charged the jurors regarding the assessment of comparative fault among *all* pertinent damage-causing actors, *including* the formerly-joined Indiana health care providers, because a negligent Kentucky defendant could have been held accountable only for the percentage of the victim's loss which corresponds to the percentage of the total causative fault which is fairly attributable to that defendant. *See Barnes,* 201 F.3d at 822–28; *Kevin Tucker & Assoc., Inc. v. Scott & Ritter, Inc.,* 842 S.W.2d 873, 874 (Ky.Ct.App.1992).

In any event, even if the assailed Instruction No. 9 and Special Interrogatory No. 3 were defective (which they were not), any error would have been harmless, because, as noted previously, the jurors initially found, via their response to Special Interrogatory No. 1, that no defendant had breached any duty of care owed to Hollar. Accordingly, because the fact-finders had exonerated *all* defendants from *any* liability to the plaintiff, no need arose for them to apportion any amount of liability attributable to the comparative fault of any other medical care-giver, including any Indiana health care provider. Hence, the plaintiff could have suffered no actual prejudice by reason of Jury Instruction No. 9,

and/or Special Interrogatory No. 3.[4]

Finally, Hollar has assigned as error three evidentiary resolutions by the presiding judge, which, he has alleged, collectively entitle him to a new trial. Trial court evidentiary rulings are scrutinized for abuse of discretion. *Barnes*, 201 F.3d at 828–29. "An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses [an] erroneous legal standard." *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir.1995) (internal quotes and citations omitted).

■ Hollar has contended that the trial court abused its discretion by disallowing his cross-examination of Dr. Cain's expert witness, Dr. Frank Wood ("Dr.Wood"), a certified orthopedic surgeon, with reference to a learned medical treatise, namely Peter Rosen and Roger Barkin, *Emergency Medicine: Concepts and Clinical Practice* (4th ed.1998). However, that authority was facially irrelevant to Dr. Wood's testimony, as he did *not* testify as an expert in emergency medicine. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Next, the plaintiff has faulted the cross-examination of Dr. Mouser, and the introduction of defense expert testimony, intended to discredit Dr. Mouser as a purported expert in emergency medicine. Hollar has protested that Dr. Mouser's qualification to testify as an emergency

medicine expert posed a question for the court, and therefore no evidence on that subject should have gone to the jury. *See* Fed.R.Evid. 601 & 702; *Mannino v. International Mfg. Co.*, 650 F.2d 846, 849 (6th Cir.1981). However, the defendants were entitled to impeach the *quality* and *reliability* of Dr. Mouser's purported expert opinions, which were matters directly relevant to the proper *weight*, if any, to be assigned to his testimony by the jurors. *See Mannino*, 650 F.2d at 851–53; *cf.* Fed.R.Evid. 703. Finally, the plaintiff has complained that the district court should not have permitted, over his objection and request for mistrial, defense counsel's cross-examination of the plaintiff regarding the contents of his administrative complaint initiated in Indiana against RMH and Dr. Rolston. However, that cross-examination was proper, because Hollar's factual allegations set forth in his state administrative complaint constituted evidentiary admissions. *See Barnes*, 201 F.3d at 829; *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555–56 (6th Cir.1986).

This reviewing forum has carefully considered all arguments framed by the plaintiff-appellant, and has found each to be unpersuasive, both individually and collectively. Accordingly, judgment for all the defendants is AFFIRMED.

---

4. In fact, because the jurors answered Special Interrogatory No. 1 negatively—that is, they concluded that no defendant had breached any duty of care owed to the plaintiff—they were instructed by Interrogatory No. 2 to "go no further" but instead to return an immediate verdict for the defendants. The jurors followed that charge; they did not answer Interrogatory No. 3, which asked them to determine the comparative fault, if any, of the Indiana health care providers. Because the jury *never reached* Interrogatory No. 3, it could not have prejudiced their decision. *See Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir.2000) (remarking that "[f]ederal courts generally presume the jury will follow the instructions correctly as given.").